# EXHIBIT A

**Table 5**
**SUMMARY OF PATENT EXAMINING ACTIVITIES**
(FY 1989 - 1993)

| Patent Examining Activity | 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|---|
| PATENT APPLICATIONS FILED | | | | | |
| Utility[1] | 150,418 | 162,708 | 166,765 | 171,623 | 173,619 |
| Reissue | 495 | 468 | 536 | 581 | 572 |
| Plant | 418 | 395 | 414 | 335 | 362 |
| Design | 11,975 | 11,140 | 10,368 | 12,907 | 13,546 |
| Total Patent Applications Filed | 163,306 | 174,711 | 178,083 | 185,446 | 188,099 |
| FIRST ACTIONS | | | | | |
| Design | 11,734 | 13,693 | 15,503 | 16,076 | 16,074 |
| Utility, Plant, and Reissue | 136,722 | 149,425 | 158,319 | 165,294 | 171,799 |
| PCT/Chapter 1 | 3,758 | 4,644 | 5,680 | 7,247 | 7,459 |
| PATENT APPLICATIONS ALLOWED[2] | | | | | |
| Design | 7,363 | 9,679 | 10,394 | 11,013 | 11,800 |
| Utility, Plant, and Reissue | 98,472 | 96,672 | 102,014 | 103,093 | 104,351 |
| Total Patent Applications Allowed | 105,835 | 106,351 | 112,408 | 114,106 | 116,151 |
| PATENT APPLICATIONS ABANDONED | | | | | |
| Design | 2,555 | 3,991 | 4,427 | 4,843 | 4,681 |
| Utility, Plant, and Reissue | 47,218 | 45,750 | 53,703 | 59,199 | 60,763 |
| Total Plant Applications Abandoned | 49,773 | 49,741 | 58,130 | 64,042 | 65,444 |
| OTHER PATENT APPLICATIONS DISPOSED | | | | | |
| Statutory Invention Registrations | 185 | 177 | 142 | 278 | 146 |
| TOTAL PATENT APPLICATION DISPOSALS | 155,793 | 156,269 | 170,680 | 178,426 | 181,741 |
| PCT/CHAPTER II EXAMINATIONS COMPLETED | 1,315 | 2,168 | 4,014 | 5,010 | 5,851 |
| PATENTS ISSUED[3] | | | | | |
| Utility | 95,831 | 88,974 | 91,822 | 99,405 | 96,676 |
| Reissue | 309 | 282 | 334 | 375 | 302 |
| Plant | 728 | 295 | 318 | 336 | 408 |
| Design | 5,844 | 7,176 | 9,386 | 9,612 | 9,946 |
| Total Patents Issued | 102,712 | 96,727 | 101,860 | 109,728 | 107,332 |
| ALLOWED APPLICATIONS, ISSUE FEE NOT PAID[4] | 3,285 | 3,476 | 4,854 | 4,781 | 5,778 |
| PENDENCY TIME OF AVERAGE PATENT APPLICATION[5] | 18.4 | 18.3 | 18.2 | 19.1 | 19.5 |
| REEXAMINATIONS REQUESTED[6] | 243 | 297 | 307 | 392 | 359 |
| REEXAMINATION CERTIFICATES ISSUED[6] | 206 | 224 | 200 | 243 | 293 |
| PCT SEARCH REPORTS PREPARED[7] | 3,469 | 4,218 | 6,000 | 6,586 | 8,714 |
| PCT INTERNATIONAL APPLICATIONS RECEIVED BY USPTO AS RECEIVING OFFICE[7] | 5,599 | 7,216 | 9,158 | 10,929 | 12,389 |
| NATIONAL REQUIREMENTS RECEIVED BY USPTO AS RECEIVING OFFICE[7] | 4,355 | 5,143 | 6,247 | 6,835 | 7,441 |
| INTERNATIONAL PRELIMINARY EXAMINATION REPORTS | 933 | 2,298 | 3,774 | 4,678 | 5,955 |
| PATENTS RENEWED UNDER P.L. 102-204[8] | 52,687 | 49,539 | 73,954 | 107,713 | 114,367 |
| PATENTS EXPIRED UNDER P.L. 102-204[8] | 12,416 | 12,060 | 19,134 | 28,603 | 38,475 |

[1] Chemical, electrical, and mechanical applications.
[2] "Allowed Patent Applications" are applications awaiting issuance (i.e., publication) as patents.
[3] Excludes withdrawn numbers.
[4] 35 U.S.C. § 151.
[5] Average time (months) between filing and issuance/abandonment of utility, plant, and reissue applications (excluding designs).
[6] Reexamination was instituted on July 1, 1981, in accordance with provisions of P.L. 95-517.
[7] PCT entered into force on January 24, 1978, and applications were accepted for filing beginning June 1, 1978.
[8] Renewal of patents under P.L. 96-517 and P.L. 97-247 now superseded by P.L. 102-204.

**STATUTORY INVENTION REGISTRATIONS PUBLISHED**
(FY 1989 - 1993)

| Assignee | 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|---|
| Agriculture | 0 | 0 | 0 | 1 | 0 |
| Air Force | 25 | 11 | 14 | 9 | 7 |
| Army | 33 | 38 | 35 | 25 | 26 |
| Energy | 21 | 14 | 17 | 11 | 9 |
| HEW/HHS | 0 | 0 | 1 | 0 | 0 |
| Navy | 16 | 14 | 11 | 20 | 13 |
| TVA | 1 | 0 | 0 | 2 | 0 |
| USA* | 0 | 1 | 4 | 6 | 2 |
| Other Than U.S. Government | 58 | 62 | 63 | 66 | 67 |
| Total | 154 | 141 | 145 | 140 | 124 |

*United States of America - no agency indicated in database.

**Table 11**
**REEXAMINATION[1]**
(FY 1989 - 1993)

| | 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|---|
| REQUESTS FILED | | | | | |
| By patent owner | 120 | 124 | 141 | 167 | 147 |
| By third party | 121 | 172 | 165 | 168 | 211 |
| Commissioner ordered | 2 | 1 | 1 | 57 | 1 |
| Total | 243 | 297 | 307 | 392 | 359 |
| DETERMINATIONS ON REQUESTS | | | | | |
| Requests granted | | | | | |
| By examiner | 215 | 243 | 267 | 316 | 311 |
| By petition | 7 | 4 | 5 | 5 | 10 |
| Requests denied | 29 | 36 | 23 | 25 | 29 |
| Total | 251 | 283 | 295 | 346 | 350 |
| REQUESTS KNOWN TO HAVE RELATED LITIGATION | 37 | 27 | 47 | 47 | 75 |
| COURT ORDERED REEXAMINATIONS | 0 | 0 | 0 | 0 | 0 |
| AVERAGE AGE OF PATENTS (years) | 5.40 | 4.60 | 5.20 | 5.00 | 5.00 |
| AVERAGE RANGE OF PATENTS (years) | 0.1-20.9 | 0.0-22.8 | 0.0-22.8 | 0.0-18.1 | ....[2] |
| AVERAGE CLAIMS PER REQUEST | 15.20 | 15.30 | 15.40 | 15.40 | ....[2] |
| AVERAGE REFERENCES PER REQUEST | 9.50 | 9.50 | 9.60 | 9.40 | 9.50 |
| FILINGS BY DISCIPLINE | | | | | |
| Chemical | 83 | 90 | 93 | 101 | 111 |
| Electrical | 87 | 113 | 115 | 186 | 138 |
| Mechanical | 73 | 94 | 99 | 105 | 110 |
| Total | 243 | 297 | 307 | 392 | 359 |

[1] Reexamination was instituted on July 1, 1961, in accordance with provisions of P.L. 96-517.
[2] Data for FY 1993 was not available.

**Table 12**
**SUMMARY OF CONTESTED PATENT CASES**

Table 1.
## Summary of Patent Examining Activities

(As of September 30 of each fiscal year)

| Patent examining activity | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| **Applications filed, total** | **201,554** | **236,679** | **206,276** | **237,045** | **256,666** |
| Utility[1] | 185,087 | 220,141 | 189,979 | 219,453 | 238,811 |
| Reissue | 430 | 647 | 573 | 606 | 693 |
| Plant | 606 | 516 | 564 | 714 | 586 |
| Design | 15,431 | 15,375 | 15,160 | 16,272 | 16,576 |
| **First actions:** | | | | | |
| Design | 16,832 | 18,223 | 15,465 | 15,038 | 16,836 |
| Utility, plant, and reissue | 168,722 | 176,220 | 179,391 | 193,635 | 192,849 |
| PCT/Chapter 1 | 8,363 | 9,454 | 11,224 | 12,268 | 13,430 |
| **Patent application disposals, total** | **189,646** | **189,520** | **197,244** | **212,763** | **220,333** |
| **Allowed[2], total** | **119,609** | **119,621** | **135,321** | **148,802** | **158,259** |
| Design | 12,388 | 13,055 | 13,627 | 13,562 | 15,214 |
| Utility, plant, and reissue | 107,221 | 106,566 | 121,694 | 135,240 | 143,045 |
| **Abandoned, total** | **69,909** | **69,796** | **61,819** | **63,878** | **61,994** |
| Design | 4,977 | 3,336 | 3,461 | 2,511 | 1,892 |
| Utility, plant, and reissue | 64,932 | 66,460 | 58,358 | 61,367 | 60,102 |
| **Statutory invention registrations, total** | **128** | **103** | **104** | **83** | **80** |
| **PCT/Chapter II examinations completed** | **6,918** | **8,040** | **8,403** | **11,582** | **12,223** |
| **Patents issued[3], total** | **113,268** | **114,241** | **116,875** | **122,977** | **154,579** |
| Utility | 101,270 | 101,895 | 104,900 | 111,979 | 139,298 |
| Reissue | 347 | 294 | 291 | 267 | 284 |
| Plant | 513 | 390 | 338 | 400 | 577 |
| Design | 11,138 | 11,662 | 11,346 | 10,331 | 14,420 |
| Allowed applications, issue fee not paid[4] | 5,883 | 5,294 | 5,408 | 5,599 | 6,853 |
| Pendency time of average patent application[5] | 19.0 | 19.2 | 20.8 | 22.2 | 23.8 |
| Reexamination requests | 379 | 392 | 418 | 376 | 350 |
| Reexamination certificates issued | 309 | 281 | 298 | 334 | 317 |
| PCT search reports prepared | 10,813 | 10,440 | 11,078 | 12,048 | 12,859 |
| PCT international applications, USPTO as receiving office | 14,265 | 15,941 | 20,106 | 22,767 | 27,138 |
| National requirements, USPTO as receiving office | 9,076 | 10,582 | 11,662 | 13,858 | 17,305 |
| International preliminary examination reports | 8,005 | 7,456 | 7,571 | 11,738 | 12,003 |
| Patents renewed under P.L. 102-204[6] | 121,104 | 140,512 | 408,944 | 138,695 | 135,462 |
| Patents expired under P.L. 102-204[6] | 38,859 | 48,604 | 60,392 | 54,485 | 41,063 |

[1]Utility patents include chemical, electrical and mechanical applications.

[2]"Allowed Patent Applications" are applications awaiting issuance (i.e., publication) as patents.

[3]Excludes withdrawn numbers.

[4]35 U.S.C. 151 (includes design applications).

[5]Average time (in months) between filing and issuance or abandonment of utility, plant, and reissue applications. This average does not include design patents.

[6]The provisions of P.L. 102-204 regarding the renewal of patents superceded P.L. 96-517 and P.L. 97-247.

Table 13.
**Reexamination**
(FY 1994 - FY 1998)

| Activity | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| **Requests filed, total** | **379** | **392** | **418** | **376** | **350** |
| By patent owner | 150 | 138 | 194 | 157 | 168 |
| By third party | 227 | 253 | 223 | 215 | 178 |
| Commissioner-ordered | 2 | 1 | 1 | 4 | 4 |
| **Determinations on requests, total** | **370** | **398** | **414** | **391** | **348** |
| Requests granted: | | | | | |
| By examiner | 334 | 372 | 386 | 357 | 315 |
| By petition | 6 | - | 8 | 4 | 2 |
| Requests denied | 30 | 26 | 20 | 30 | 31 |
| **Requests known to have related litigation** | **77** | **100** | **89** | **65** | **66** |
| **Filings by discipline, total** | **379** | **392** | **418** | **376** | **350** |
| Chemical | 102 | 101 | 127 | 123 | 120 |
| Electrical | 146 | 131 | 127 | 100 | 94 |
| Mechanical | 131 | 160 | 164 | 153 | 136 |

- Represents zero.

UNITED STATES PATENT AND TRADEMARK OFFICE

OTHER ACCOMPANYING INFORMATION

| TABLE 1 | SUMMARY OF PATENT EXAMINING ACTIVITIES | | | | |
|---|---|---|---|---|---|
| | (As of September 30 of each fiscal year) | | | | |
| **PATENT EXAMINING ACTIVITY** | **1998** | **1999** | **2000** | **2001** | **2002** |
| **Applications filed, total** | **256,666** | **278,268** | **311,807** | **344,717** | **353,394** |
| Utility /1, /2 | 238,850 | 259,618 | 291,653 | 324,211 | 331,580 |
| Reissue /2 | 582 | 664 | 805 | 956 | 974 |
| Plant /2 | 658 | 759 | 786 | 914 | 1,134 |
| Design | 16,576 | 17,227 | 18,563 | 18,636 | 19,706 |
| **Provisional Applications Filed /3** | **41,622** | **54,727** | **78,963** | **86,123** | **89,537** |
| **First actions** | | | | | |
| Design | 16,836 | 18,050 | 17,856 | 17,748 | 19,029 |
| Utility, Plant, and Reissue | 192,849 | 226,642 | 237,421 | 241,770 | 275,055 |
| PCT/Chapter 1 | 13,430 | 14,316 | 16,331 | 17,972 | 19,460 |
| **Patent application disposals, total** | **220,333** | **238,292** | **252,871** | **257,467** | **279,297** |
| **Allowed patent applications, total /3** | **158,259** | **171,685** | **182,888** | **183,394** | **189,191** |
| Design | 15,214 | 16,305 | 16,688 | 16,526 | 17,377 |
| Utility, Plant, and Reissue | 143,045 | 155,380 | 166,200 | 166,868 | 171,814 |
| **Abandoned, total** | **61,994** | **66,493** | **69,895** | **74,014** | **90,092** |
| Design | 1,892 | 2,431 | 1,839 | 1,448 | 1,675 |
| Utility, Plant, and Reissue | 60,102 | 64,062 | 68,056 | 72,566 | 88,417 |
| **Statutory invention registration disposals, total** | **80** | **114** | **88** | **59** | **14** |
| **PCT/Chapter II examinations completed** | **12,223** | **12,886** | **15,471** | **18,859** | **16,456** |
| **Patents issued /4** | **154,579** | **159,166** | **182,223** | **187,822** | **177,317** |
| Utility | 139,298 | 142,856 | 164,490 | 169,576 | 160,843 |
| Reissue | 284 | 437 | 561 | 504 | 466 |
| Plant | 577 | 393 | 453 | 563 | 912 |
| Design | 14,420 | 15,480 | 16,719 | 17,179 | 15,096 |
| Allowed applications, issue fee not paid /5 | 6,853 | 4,000 | 7,633 | 6,985 | 6,928 |
| Pendency time of average patent application /6 | 23.8 | 25.0 | 25.0 | 24.7 | 24.0 |
| Reexamination requests | 350 | 385 | 318 | 296 | 272 |
| Reexamination certificates issued | 317 | 243 | 276 | 287 | 200 |
| PCT search reports prepared | 12,859 | 14,116 | 15,896 | 16,692 | 19,646 |
| PCT international applications received by | | | | | |
| USPTO as receiving office | 27,138 | 30,305 | 36,671 | 43,322 | 42,889 |
| National requirements received by USPTO as designated/elected office | 17,305 | 19,941 | 23,628 | 26,821 | 29,846 |
| International preliminary examination reports | 12,003 | 14,615 | 15,044 | 17,740 | 17,949 |
| Patents renewed under P.L. 102-204 /7 | 135,462 | 156,414 | 206,255 | 205,117 | 194,143 |
| Patents expired under P.L. 102-204 /7 | 41,063 | 52,289 | 47,958 | 49,077 | 53,724 |

1/ Utility patents include chemical, electrical and mechanical applications.
2/ Utility, Plant, and Reissue applications revised from 1996 - 2000 to reflect the latest actual counts in PALM.
3/ Allowed Patent Applications are applications awaiting issuance (i.e., publication) as patents.
4/ Excludes withdrawn numbers.
5/ 35 U.S.C. § 151 (includes design applications).
6/ Average time (in months) between filing and issuance or abandonment of utility, plant, and reissue applications. This average does not include design patents.
7/ The provisions of P.L. 102-204 regarding the renewal of patents superceded P.L. 96-517 and P.L. 97-247. FY 1999 column revised from FY 1999 report.

OTHER ACCOMPANYING INFORMATION

| TABLE 13A | EX PARTE REEXAMINATION (FY 1998 - FY 2002) | | | | |
|---|---|---|---|---|---|
| **ACTIVITY** | **1998** | **1999** | **2000** | **2001** | **2002** |
| **Requests filed, total** | **350** | **385** | **318** | **296** | **272** |
| By patent owner | 168 | 173 | 137 | 144 | 121 |
| By third party | 178 | 181 | 172 | 150 | 140 |
| Commissioner ordered | 4 | 31 | 9 | 2 | 11 |
| | | | | | |
| **Determinations on requests, total** | **348** | **367** | **338** | **342** | **272** |
| Requests granted: | | | | | |
| By examiner | 315 | 327 | 320 | 263 | 262 |
| By petition | 2 | 1 | 2 | 2 | 1 |
| Requests denied | 31 | 39 | 16 | 77 | 9 |
| | | | | | |
| **Requests known to have related litigation** | **66** | **62** | **80** | **80** | **52** |
| | | | | | |
| **Filings by discipline, total** | **350** | **385** | **318** | **296** | **272** |
| Chemical | 120 | 138 | 96 | 90 | 87 |
| Electrical | 94 | 107 | 103 | 89 | 78 |
| Mechanical | 136 | 140 | 119 | 117 | 107 |

| TABLE 13B | INTER PARTES REEXAMINATION (FY 2000 - FY 2002) | | |
|---|---|---|---|
| **ACTIVITY** | **2000** | **2001** | **2002** |
| **Requests filed, total** | **-** | **1** | **4** |
| **Determinations on requests, total** | **-** | **-** | **5** |
| Requests granted: | - | - | 5 |
| By examiner | - | - | - |
| By petition | - | - | - |
| Requests denied | - | - | - |
| | | | |
| **Requests known to have related litigation** | **-** | **-** | **-** |
| | | | |
| **Filings by discipline, total** | **-** | **1** | **4** |
| Chemical | - | 1 | 2 |
| Electrical | - | - | - |
| Mechanical | - | - | 2 |



**United States Patent and Trademark Office**     **ABOUT**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Reports > USPTO Annual Reports**

## Performance and Accountability Report Fiscal Year 2007
### Other Accompanying Information

Table of Contents | Management | Financial | Auditor | IG | Other

### TABLE 1: SUMMARY OF PATENT EXAMINING ACTIVITIES (FY 2003 - FY 2007)

#### PRELIMINARY FOR FY 2007 [1]

| Patent Examining Activity | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| **Applications filed, total** [2] | **355,418** | **378,984** | **409,532** | **445,613** | **467,243** |
| Utility [3] | 331,729 | 353,319 | 381,797 | 417,453 | 438,576 |
| Reissue | 938 | 996 | 1,143 | 1,204 | 994 |
| Plant | 785 | 1,212 | 1,288 | 1,103 | 1,047 |
| Design | 21,966 | 23,457 | 25,304 | 25,833 | 26,626 |
| | | | | | |
| **Provisional Applications Filed** [4] | **92,517** | **102,268** | **111,753** | **121,471** | **132,352** |
| | | | | | |
| **First actions** | | | | | |
| Design | 19,013 | 17,328 | 20,108 | 23,291 | 29,029 |
| Utility, Plant, and Reissue | 283,111 | 288,315 | 297,287 | 320,349 | 367,953 |
| PCT/Chapter | 23,277 | 17,935 | 22,795 | 25,034 | 24,741 |
| | | | | | |
| **Patent application disposals, total** | **303,635** | **304,921** | **298,838** | **332,535** | **362,227** |

Case 3:08-cv-00309-BTM-CAB     Document 13-3     Filed 04/16/2008     Page 9 of 43

| | | | | | |
|---|---|---|---|---|---|
| **Allowed patent applications, total** | **205,879** | **195,611** | **182,254** | **186,593** | **195,530** |
| Design | 17,596 | 16,262 | 18,161 | 20,721 | 25,747 |
| Utility, Plant, and Reissue | 188,283 | 179,349 | 164,093 | 165,872 | 169,783 |
| **Abandoned, total** | **97,745** | **109,295** | **116,564** | **145,912** | **166,690** |
| Design | 1,569 | 1,471 | 1,332 | 2,125 | 2,661 |
| Utility, Plant, and Reissue | 96,176 | 107,824 | 115,232 | 143,787 | 164,029 |
| **Statutory invention registration disposals, total** | **11** | **15** | **20** | **30** | **7** |
| **PCT/Chapter II examinations completed** | **21,005** | **19,439** | **12,594** | **7,295** | **5,336** |
| **Applications Published** [5] | **243,007** | **248,561** | **291,221** | **291,259** | **302,678** |
| **Patents issued** [6] | **189,590** | **187,170** | **165,483** | **183,187** | **184,377** |
| Utility | 171,493 | 169,296 | 151,077 | 162,509 | 160,308 |
| Reissue | 394 | 343 | 195 | 500 | 546 |
| Plant | 1,178 | 998 | 816 | 1,106 | 979 |
| Design | 16,525 | 16,533 | 13,395 | 19,072 | 22,544 |
| Pendency time of average patent application [7] | 26.7 | 27.6 | 29.1 | 31.1 | 31.9 |
| Reexamination certificates issued | 193 | 138 | 223 | 329 | 367 |
| PCT international applications received by USPTO as receiving office [2] | 42,969 | 45,396 | 46,926 | 52,524 | 52,214 |

| | | | | | |
|---|---|---|---|---|---|
| National requirements received by USPTO as designated/elected office [2], [8] | 32,753 | 37,173 | 41,256 | 48,158 | 52,339 |
| Patents renewed under Public Law (P.L.) 102-204 [9] | 253,475 | 269,815 | 268,935 | 324,913 | 343,894 |
| Patents expired under P.L. 102-204 [9] | 57,770 | 63,552 | 67,534 | 72,654 | 67,122 |

**Notes:**

1: FY 2007 data are preliminary and will be finalized in the FY 2008 PAR. *(back to text)*

2: FY 2006 application data has been updated with final end of year numbers. *(back to text)*

3: Utility patents include chemical, electrical and mechanical applications. *(back to text)*

4: Provisional applications provided for in Pub.L. 103-465. *(back to text)*

5: Eighteen-month publication of patent applications provided for in the American Inventors Protection Act of 1999, Pub.L. 106-113. *(back to text)*

6: Excludes withdrawn numbers. Past years' data may have been revised from prior year reports. *(back to text)*

7: Average time (in months) between filing and issuance or abandonment of utility, plant, and reissue applications. This average does not include design patents. *(back to text)*

8: FY 2005 data has been updated. *(back to text)*

9: The provisions of Pub.L. 102-204 regarding the renewal of patents superceded Pub.L. 96-517 and Pub.L. 97-247. *(back to text)*

**< Previous Page | Next Page >**

*Is there a question about what the USPTO can or cannot do that you cannot find an answer for? Send questions about USPTO programs and services to the* **USPTO Contact Center (UCC).** *You can suggest USPTO webpages or material you would like featured on this section by E-mail to the* **webmaster@uspto.gov.** *While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.*



**United States Patent and Trademark Office**          **ABOUT**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Reports  >  USPTO Annual Reports**

## Performance and Accountability Report Fiscal Year 2007
### Other Accompanying Information

Table of Contents | Management | Financial | Auditor | IG | Other

### TABLE 13A: EX PARTE REEXAMINATION
### (FY 2003 - FY 2007)

| Activity | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| **Requests filed, total** | **392** | **441** | **524** | **511** | **643** |
|    By patent owner | 136 | 166 | 166 | 129 | 124 |
|    By third party | 239 | 268 | 358 | 382 | 519 |
|    Commissioner ordered | 17 | 7 | – | – | – |
| | | | | | |
| **Determinations on requests, total** [1] | **381** | **419** | **537** | **458** | **594** |
|   Requests granted: | | | | | |
|     By examiner | 360 | 408 | 509 | 422 | 575 |
|     By petition | 1 | – | 2 | 5 | 2 |
|   Requests denied | 20 | 11 | 26 | 31 | 17 |
| | | | | | |
| **Requests known to have related litigation** | **109** | **138** | **176** | **229** | **369** |
| | | | | | |
| **Filings by discipline, total** | **392** | **441** | **524** | **511** | **643** |
|   Chemical | 124 | 130 | 138 | 118 | 133 |
|   Electrical | 118 | 156 | 188 | 228 | 275 |
|   Mechanical | 150 | 155 | 198 | 165 | 235 |

Case 3:08-cv-00309-BTM-CAB     Document 13-3     Filed 04/16/2008     Page 12 of 43

**Notes:**

1: Past years' data have been revised from prior year reports. *(back to text)*

## < Previous Page | Next Page >

*Is there a question about what the USPTO can or cannot do that you cannot find an answer for? Send questions about USPTO programs and services to the* **USPTO Contact Center (UCC).** *You can suggest USPTO webpages or material you would like featured on this section by E-mail to the* **webmaster@uspto.gov**. *While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.*

.**|HOME | SITE INDEX| SEARCH | *e*BUSINESS | HELP | PRIVACY POLICY**

Last Modified: 12/21/2007 05:56:35

# EXHIBIT B

# CALCULATION OF AVERAGE TIME FOR COMPLETION OF PATENT REEXAMINATION
(bold figures are from USPTO Annual Reports)

| | Ex Parte Filing Nos. | Related to Litigation | Percentage Related to Lit | # Deter | Ex Parte Reexams Accepted | Certificates Issued | # Granted less Certificates Issued | Reexam Backlog |
|---|---|---|---|---|---|---|---|---|
| 1989 | 243 | 37 | 15% | 251 | 222 | 206 | 16 | 16 |
| 1990 | 297 | 27 | 9% | 283 | 247 | 224 | 23 | 39 |
| 1991 | 307 | 47 | 15% | 295 | 272 | 200 | 72 | 111 |
| 1992 | 392 | 47 | 12% | 346 | 321 | 243 | 78 | 189 |
| 1993 | 359 | 75 | 21% | 350 | 321 | 293 | 28 | 217 |
| 1994 | 379 | 77 | 20% | 370 | 340 | 309 | 31 | 248 |
| 1995 | 392 | 100 | 26% | 398 | 372 | 281 | 91 | 339 |
| 1996 | 418 | 89 | 21% | 414 | 386 | 298 | 88 | 427 |
| 1997 | 376 | 65 | 17% | 391 | 361 | 334 | 27 | 454 |
| 1998 | 350 | 66 | 19% | 348 | 317 | 317 | 0 | 454 |
| 1999 | 385 | 62 | 16% | 367 | 328 | 243 | 85 | 539 |
| 2000 | 318 | 80 | 25% | 338 | 322 | 276 | 46 | 585 |
| 2001 | 296 | 80 | 27% | 342 | 265 | 287 | -22 | 563 |
| 2002 | 272 | 52 | 19% | 272 | 263 | 200 | 63 | 626 |
| 2003 | 392 | 109 | 28% | 381 | 361 | 193 | 168 | 794 |
| 2004 | 441 | 138 | 31% | 419 | 408 | 138 | 270 | 1064 |
| 2005 | 524 | 176 | 34% | 535 | 511 | 223 | 288 | 1352 |
| 2006 | 511 | 229 | 45% | 453 | 425 | 329 | 96 | 1448 |
| 2007 | 643 | 369 | 57% | 594 | 577 | 367 | 210 | 1658 |



GROWTH OF REEXAM BACKLOG

# EXHIBIT C

**Notice of Changes in Requirement
for a Substantial New Question of Patentability for
a Second or Subsequent Request for Reexamination
While an Earlier Filed Reexamination is Pending**

**A. Summary:**  The United States Patent and Trademark Office (Office) revised section 2240 of the Manual of Patent Examining Procedure (MPEP) in May of 2004 to set forth a new policy when a second or subsequent request for reexamination is filed while an "earlier filed reexamination" is **pending**, and the second or subsequent request cites only prior art (hereinafter "old art") which raised a substantial new question of patentability (SNQ) in the pending reexamination proceeding.  See MPEP § 2240 (8th ed. 2001)(Rev. 2, May 2004).  Under the new policy, the second or subsequent request for reexamination will be ordered **only** if that old prior art raises a substantial new question of patentability which is **different** than that raised in the pending reexamination proceeding.  If the old prior art cited (in the second or subsequent request) raises only the same issues that were raised to initiate the pending reexamination proceeding, the second or subsequent request will be denied.

It is to be noted that reliance on prior art cited in the pending reexamination (old art) does not preclude the existence of a SNQ that is based exclusively on that old art.  Determinations on whether a SNQ exists in such an instance shall be based upon a fact-specific inquiry done on a case-by-case basis.  For example, a SNQ may be based solely on old art where the old art is being presented/viewed in a new light, or in a different way, as compared with its use in the earlier concluded examination(s), in view of a material new argument or interpretation presented in the request. The presentation/viewing of old art in a new light, or in a different way, is discussed in Ex parte Chicago Rawhide, 223 USPQ 351 (Bd. Pat. App. & Inter. 1984).

**B. Background:**  A request for ex parte reexamination of a patent pursuant to 35 U.S.C. 302, and a request for inter partes reexamination of a patent pursuant to 35 U.S.C. 311, must raise a substantial new question of patentability (SNQ) in order for a reexamination of the patent to be initiated.  More than one reexamination request may be filed for the same patent, and a second or subsequent reexamination request for reexamination of a patent, where a first reexamination proceeding is pending, has historically been granted based on the **same** prior art that raised the SNQ in a pending first reexamination proceeding.

It has been the Office's experience, however, that both patent owners and third party requesters have used a second or subsequent reexamination request (based on the same substantial new question of patentability initially raised or existing in the pending reexamination proceeding) to prolong the reexamination proceeding, and in some instances, to turn it essentially into an inter partes proceeding.  These actions by patent owners and third party requesters have resulted in multiple reexaminations taking years to conclude, thus making it extremely difficult for the Office to conclude reexamination proceedings with "special dispatch" as required by statute (35 U.S.C. 305 for ex parte reexamination, 35 U.S.C. 314 inter partes reexamination).  For example, under the prior practice, a patent owner whose claims are rejected in a pending

reexamination proceeding could repeatedly file multiple ex parte reexamination requests based on the same substantial new question of patentability raised, or existing, in the pending reexamination proceeding.  By doing so, the patent owner could keep the reexamination proceeding pending indefinitely, to delay the issue of a reexamination certificate canceling the claims of the patent being reexamined.  Additionally, a third party requester could file a second or subsequent reexamination request, while a first reexamination proceeding is pending, based on the same substantial new question of patentability raised, or existing, in the first reexamination proceeding, in order to address any responses to Office actions made by the patent owner.  This use of a second or subsequent reexamination request has permitted third party requesters to, in effect, obtain an inter partes type of reexamination process in an ex parte reexamination proceeding.

Moreover, concerns regarding lengthy ex parte reexamination pendency resulting from multiple reexamination request filings were raised by witnesses at the Office's Round Table on the Equities of Inter Partes Reexamination Proceedings held February 17, 2004.

**C.  Implementation of New Policy:**  Responsive to these concerns, the Office revised its policy to be as is now set forth in the current (May 2004) revision of MPEP § 2240, that is:  **the SNQ for a second or subsequent request for reexamination must be new and different than any SNQ that was raised, or existed, during any prior pending or concluded reexamination proceeding for the patent.**  This revised policy is consistent with the statutory mandate of special dispatch and the intent of the ex parte reexamination statute (an ex parte reexamination proceeding is not an inter partes type of reexamination process).  Further, 35 U.S.C. 303(a) states that "[w]ithin three months following the filing of a request for reexamination under the provisions of section 302 of this title, the Director will determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request."  It is reasonable to interpret this provision as requiring each request for reexamination to raise its own substantial new question of patentability as compared not only to the original prosecution (in the application for the patent) and any earlier, concluded reexamination proceedings, but to pending reexamination proceedings as well.  To accompany the revision of MPEP § 2240, MPEP § 2640, which was newly added to the MPEP in May of 2004 to address inter partes reexamination proceedings, was drafted to implement this revision of policy for inter partes reexamination proceedings.

**D.  Transition Procedure:**  It is noted that, as a consequence of the changes made to MPEP § 2240, a patent owner will now be prevented from obtaining entry of an amendment and/or evidence not entered after final rejection in an ex parte reexamination proceeding by filing another request for reexamination based on the same substantial question of patentability raised/existing in the pending reexamination proceeding. In order to provide relief to the patent owner, the Office plans to propose a revision to the patent rules to provide for the filing of a request for continued reexamination (RCR) which would be similar to the request for continued examination (RCE) practice for applications. If the RCR practice is implemented, the patent owner, by filing an RCR, could obtain continued prosecution on the merits in the reexamination

2

proceeding, including entry of an amendment and/or evidence that was denied entry after a final rejection in an <u>ex parte</u> reexamination proceeding or after an action closing prosecution in an <u>inter partes</u> reexamination proceeding.

Until these new rules become effective, however, patent owners are advised to use either:  (1) the petition procedure under 37 CFR § 1.181 to seek review of a denial of entry of an amendment submitted after final rejection in an <u>ex parte</u> reexamination proceeding or after an action closing prosecution in an <u>inter partes</u> reexamination proceeding; or (2) the petition procedure under 37 CFR § 1.182 to seek relief that is not currently provided by an existing rule, but that would be provided when a new request for continued reexamination (RCR) practice is in effect.

**E. Inquiries:**  Inquiries regarding this matter may be directed to Kenneth M. Schor, Senior Legal Advisor, Office of Patent Legal Administration at telephone:  (571) 272-7710.

Date:  _____2/2/05_____          Signed:___/S/_____
                                       JOSEPH J. ROLLA
                                       Deputy Commissioner
                                        for Patent Examination Policy

3

# EXHIBIT D

# Pre-litigation Strategies: Patent Reexamination

February 23, 2004

By **Robert E. Krebs**

## Introduction

The costs of  patent litigation — both in terms of time and money — have been well documented.  For example, a patent  lawsuit can require several years of concerted effort by company management and outside counsel to complete pretrial discovery and trial.  Then, the trial may be followed by an appeal to the Federal Circuit Court of Appeals.

The costs and commercial uncertainty of patent litigation have been addressed by Congress in the "21st Century Dept. of Justice Appropriations Authorization Act of 2002.  The Act amended a procedure, first created by Congress in 1980, for reexamination of patents in the U.S. Patent and Trademark Office ("PTO").  The reexamination procedure was expanded by Congress  in 1999, when it provided for "*inter partes*" reexamination.  The legislative purpose of "*inter partes*" reexamination is explained in the Congressional Record as follows:

> Generally, Title V is intended to reduce expensive patent litigation in U.S. district courts by giving third-party requesters, in addition to the existing *ex parte* reexamination in Chapter 30 of title 35, the option of *inter partes* reexamination proceedings in the PTO. Congress enacted legislation to authorize *ex parte* reexamination of patents in the PTO in 1980, but such reexamination has been used infrequently since a third party who requests reexamination cannot participate at all after initiation the proceedings. Numerous witnesses have suggested that the volume of lawsuits in district courts will be reduced if third parties can be encouraged to use reexamination by giving them an opportunity to argue their case for patent invalidity in the PTO.  Title V provides that opportunity as an option to the existing parte reexamination procedures.[1]

This paper summarizes the reexamination process and discusses strategies for a patent challenger.  It should be noted that two principal issues are usually present in every patent litigation: a) the question of validity of the patent in view of the prior art, and b) the question of the scope of the claims of the patent. As will be explained below, patent validity may be resolved in the reexamination process and, also,  the scope of the patent claims may be altered.

**Thelen Reid & Priest LLP**
*Attorneys At Law*

## *Ex parte* Reexamination

In a *ex parte* reexamination, either a challenger or patent holder may seek reexamination of a patent based on patents or printed publications.[2] The requester files the request for reexamination, and within three months the PTO determines whether a substantial new question of patentability exists.[3] If so, the PTO orders reexamination of the patent.[4] A determination of no substantial new question is final and non-appealable.[5]

If the PTO orders reexamination, the patent holder is given the opportunity to file a statement concerning the new question of patentability, including amendments or new claims he/she wants to propose.[6] (Provided, however, that the claims may not be broadened.)[7] If the patent holder files such a statement, the statement must be served on the person requesting reexamination, and the requester is given two months to file a reply to the patent owner's statement.[8] From that point on the claims are examined without participation by the requester. Following the *ex parte* reexamination, the PTO issues a certificate canceling any claim determined to be unpatentable, confirming any claim determined to be patentable and incorporating in the patent any new claim or amended claim determined to be patentable.[9]

## *Inter partes* Reexamination

*Inter partes* reexaminations are similar to *ex parte* proceedings in some ways. Both are initiated by a request for reexamination.[10] Also, the only ground for seeking reexamination under either process is prior art consisting of patents or printed publications.[11] Furthermore, at the outset, the PTO determines whether the request raises a substantial new question of patentability.[12]

If the PTO determines that there is a substantial new question of patentability, an *inter partes* reexamination is ordered.[13] Thereafter, just as in an *ex parte* proceeding, the third party requester will be provided with a copy of Office Actions issued by the PTO.[14] Also, just as in an *ex parte* proceeding, the third party requester will be provided a copy of the patent owner's responses to Office Actions. However, unlike an *ex parte* proceeding, the third party requester may reply to the Office Actions and to the patent owner's responses.[15]

After the Examiner has reached a final decision in an *inter partes* proceeding, either the patent owner or the requester may appeal an adverse finding to the PTO Board of Patent Appeals and Interferences. After the Board reaches its decision, either party may appeal to the U.S. Court of Appeals for the Federal Circuit from an adverse determination.[16] On the other hand, in an *ex parte* case, the requester does not have comparable options of appeal either to the Board or to the Court.

A critical difference between *inter partes* and *ex parte* proceedings concerns *estoppel*. Unlike an *ex parte* requester, the *inter partes* requester will be estopped, in subsequent litigation in a district court or a subsequent *inter partes* proceeding, to assert the invalidity of any claim finally determined to be valid on any ground which is raised or could have been raised in the *inter partes* reexamination.[17]

## Strategic Considerations

In both *ex parte* and *inter partes* proceedings the patent challenger has the opportunity to submit prior art for consideration by the Examiner.  The patent challenger, of course, has the ability to do a thorough search of the prior art to find art which may be used to invalidate the patent or limit the scope of the claims so the challenger's product does not infringe.

Whether to pursue patent reexamination – whether  *inter partes* or *ex parte* – involves the balancing of significant considerations.  The major advantage to a patent challenger of the *inter partes* procedure over the *ex parte* procedure is that in the *inter partes* procedure the challenger has the right to participate throughout the process, for example, by supplying prior art and by filing rebuttals to arguments submitted by the patentee.  Also, the challenger can submit arguments supporting the Examiner when the Examiner takes a position unfavorable to the patentee, and the challenger can submit declarations by technical experts concerning the patent and the prior art.

The challenger however, must consider certain disadvantages to the reexamination process.  One important consideration is that the process gives the patentee the opportunity to amend its claims and to add new claims.   While the patentee may not broaden the scope of its claims, patentee may amend the claims to:

1.  make them patentable in view of the prior art, including the new prior art cited by the challenger, and

2.  make them more clearly cover the challenger's allegedly infringing product.

Another major disadvantage to the challenger, in  the *inter partes* process, is that the challenger is estopped from challenging the patent in court, except in very limited circumstances.  Thus, the *inter partes* challenger must be prepared to do its best job before the PTO because it is unlikely to get another opportunity if it fails to achieve the results it desires there. ∎

*For more information, please contact:*

## Robert E. Krebs

**Co-Chair, Intellectual Property and Trade Regulation Group**
408.282.1823
rkrebs@thelenreid.com

**Thelen Reid & Priest LLP**

## Endnotes

[1] American Inventors Protection Act Of 1999, Extension Of Remarks, House of Representatives, Cong. Rec. E1789 (Hon. Howard Coble, August 05, 1999).

[2] 35 U.S.C. §§ 301, 302, 37 CFR §1.510

[3] 35 U.S.C. §§ 303, 37 CFR §1.515

[4] 35 U.S.C. § 304, , 37 CFR §1.525

[5] 35 U.S.C. § 303

[6] 35 U.S.C. §§ 304, 305, 37 CFR §1.530(b)

[7] 35 U.S.C. § 305

[8] 35 U.S.C. §§ 304, 37 CFR §1.535

[9] 35 U.S.C. § 307, 37 CFR § 1.570

[10] 35 U.S.C. §§ 302, 311(a), 37 CFR §§ 1.510, 1.913

[11] Id.

[12] 35 U.S.C. §§ 303, 312(a), 37 CFR §§ 1.513, 1.931

[13] 35 U.S.C. §313, 37 CFR §1.931

[14] 35 U.S.C. §314(b), 37 CFR §1.903

[15] 35 U.S.C. §314(b), 37 CFR §1.947

[16] 35 U.S.C. §315, 37 CFR §1.959

[17] 35 U.S.C. §§ 315(c), 317(b)

©2004 By Thelen Reid & Priest LLP. This article has been published as an information service to clients and friends. Please recognize that the information is general in nature and must not be relied upon as legal advice. The authors, listed above, or your Thelen Reid attorney contact, would be happy to discuss the information in this article in greater detail and its application to your specific situation. We welcome your comments and suggestions.

**Thelen Reid & Priest LLP**

# EXHIBIT E



| Tuesday, June 12, 2007 | editor@sddt.com | http://www.sddt.com | Source Code: 20070612tzb |

## New local rules pave way to speedier patent trials

**By DAVID KLEINFELD AND JOHN BENASSI**
Tuesday, June 12, 2007

One of the first questions a patent-holder faces after deciding it is time to sue an infringer is: "Where should we file?"

For many companies, including many San Diego-based companies, the answer to that question has been to pack the bags and head out of town.

Some plaintiffs, hoping for a quick resolution to their claims, travel to such far-flung jurisdictions as the Eastern District of Texas or the Eastern District of Virginia, both of which are thought to have a 'rocket-docket' for patent cases.

Others, looking for courts they perceive to be more patent-savvy, will head for jurisdictions such as the Northern District of California or the Northern District of Illinois, that have been trying a large volume of patent cases for a couple of decades.

But the calculus is changing, both for San Diego companies and for others, thanks in large part to the Southern District of California's recent adoption of a comprehensive set of local patent-litigation rules and a growing enthusiasm for patent cases among members of the local federal bench.

### New local patent-litigation rules

One of the main objectives of the new patent rules, which have been in force for just over a year, is to provide predictable and uniform treatment for intellectual property litigants and streamline the process by which a patent case is litigated, shortening the time to trial or settlement and thereby reducing costs for all parties involved. To this end, the new rules set up a schedule that will bring the parties to the all-important claim construction (or Markman) hearing approximately nine months after the complaint is filed. Having the Markman hearing as early as practically possible is crucial for litigants seeking a timely resolution because the claim construction order issued by the court after the hearing generally has a profound impact on the rest of the case. The parties will sometimes be inclined to settle once they have seen how the court construes the patent claims at issue. If not, the Markman ruling provides focus for the remaining discovery, dispositive motion practice and trial preparation.

Indeed, it is largely because of the early-scheduled Markman hearing that Southern District judges can now set trial dates for 18 months after complaints are filed. Judge Dana M. Sabraw, who chaired the committee that established the new patent local rules, says: "A majority of the judges of the Southern District are firmly committed to holding claim construction hearings within nine months of the filing of the complaint, and to setting a trial date within 18 months of that filing."

In addition to providing a brisk pace for patent litigation, the new rules also establish orderly, uniform procedures for some of the disclosures and discovery unique to patent lawsuits, bringing the Southern District in line with other jurisdictions such as the Northern District of California and Eastern District of Texas. For example, the patentee's chart "Disclosure of Asserted Claims and Preliminary Infringement Contentions" is due 14 days after the initial CMC. The accused infringer's "Preliminary Invalidity Contentions," accompanied by documents supporting those contentions, are due 60 days later. The parties' first proposed claim constructions follow within a month, and, as in some other jurisdictions, the parties then prepare refined claim charts for submission to the court. Experienced patent litigators used to working in other jurisdictions will likely find these disclosure/discovery rules familiar, predictable and convenient.

The new patent local rules also incorporate an existing feature unique to Southern District litigation practice: the Early Neutral Evaluation (ENE). As local practitioners know, and as out-of-town litigants will learn if they choose to avail themselves of the southern district, the ENE provides the parties with a real opportunity to settle the case before spending substantial time and money. Experienced magistrate judges with the power to compel principals to appear in chambers will try to help the parties reach a deal and will usually remind both sides that it is often wise to settle rather than roll the dice on a jury trial.

### More judges means faster time to trial

Another factor that will likely accelerate time to trial in the Southern District is that after years of suffering a

shortage of seated judges the court finally has a full bench. For many years, the Southern District operated with less than its full complement of judges, was forced to rely on senior judges and was even forced to borrow judges from other districts to fill the void. A litigation backlog was the inevitable result. Thanks to a recent increase in funding, however, since 2003 the Southern District has had its full complement of judges, many of whom are ready and willing to take on patent cases. Sabraw is one of the newly appointed judges, and he says: "My colleagues and I are very interested in patent cases, and are eager to tackle the difficult and challenging issues they present. With Judge Brewster's retirement on the horizon, more of us hope and expect to receive a wider variety of patent cases, and to continue Judge Brewster's thorough and thoughtful treatment of them." Again, we can expect to see faster times to trial as patent cases can now be distributed to more judges.

Issa specialized patent docket legislation

Another, even more recent development that may help turn the Southern District into a patent litigation destination is the passage of HR 34 in February. Shepherded through the House of Representatives by congressmen Darrell Issa, R-Calif, (himself an inventor and patent holder) and Adam Schiff, D-Calif., the bill provides a modest-sized pilot program ($5 million a year for 10 years) to allow select jurisdictions -- the Southern District is a frontrunner to be one of them -- to become more fluent in resolving patent disputes. The legislation encourages judges to opt-in to (or opt-out of) patent cases and provides opt-in judges with funding for educational and professional development and for law clerks with technical backgrounds.

"The prospect of having several judges that are 'experts' in patent law is exciting," says Sabraw. "It would be a great benefit not only to the court, but also to the practitioners and parties that appear in the Southern District."

**An excellent result for San Diego**

Streamlining the local patent-litigation rules and having a greater number of patent-savvy judges on the bench will result in a more efficient and informed federal court in San Diego. As a result, we can expect to see more San Diego companies filing patent cases here in their home court and more out-of-town patent holders making San Diego a destination for the speedy, efficient resolution of their important patent infringement actions. This promises to be an excellent result for both Southern California technology companies and our court system.

*David Kleinfeld and John Benassi are shareholders at Heller Ehrman LLP. Kleinfeld is co-chair of the firmwide Complex Commercial Litigation Group. Benassi is managing partner of the San Diego office.*

**EXHIBIT F**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GLOBAL PATENT HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 00 C 4623 |
| | ) | |
| GREEN BAY PACKERS, INC., | ) | Judge Charles P. Kocoras |
| NAPLETON ELMHURST IMPORTS. | ) | Mag. Judge Geraldine Brown |
| INC. D/B/A ED NAPLETON ACURA, | ) | JURY TRIAL DEMANDED |
| ORBITZ WORLDWIDE, INC., | ) | |
| PEAPOD, LLC, OFFICEMAX INC., and | ) | |
| CATERPILLAR INC. | ) | |
| | ) | |
| Defendants. | ) | |

**GLOBAL PATENT HOLDINGS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR A STAY PENDING REEXAMINATION OF THE PATENT IN SUIT**

Raymond P. Niro
Dean D. Niro
Arthur A. Gasey
Paul C. Gibbons
Douglas M. Hall
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602-4515
(312) 236-0733
Fax: (312) 236-3137

## I.    INTRODUCTION

According to the Green Bay Packers and the other defendants, this lawsuit must be stayed -- again -- for an indefinite period pending "final determination of reexamination" (Defs. Brf. at 1) because: (1) "the Reexamination **should be** swiftly resolved" (Defs. Brf. at 8); (2) the Reexamination will "facilitate trial of that issue by providing the district court with the expert view of the PTO" (Defs. Brf. at 10); and (3) GPH would not face irreparable damage from yet another stay because "GPH has not moved for a preliminary injunction against any of the Defendants[.]"  (Defs. Brf. at 9). The Defendants' motion ignores a number of key facts:

- This case was filed in 2000, yet it is in its "earliest stages" only because of the earlier stay related to the first of two requests for reexamination: the PTO re-examined the '341 patent once, taking **more than seven years** to confirm the patentability of claim 17, which is at issue in this lawsuit.   Notwithstanding the statutory requirement for "special dispatch" upon which Defendants now rely (Defs. Brf. at 3), there was nothing quick about the first re-examination process.

- There is nothing to suggest that a second reexamination would be completed any more quickly.  Indeed, it would probably be slower still: the first re-examination, which began on June 9, 2000, lasted until July 24, 2007. The first re-examination began with the citation of one single reference – a patent issued to Filepp – and grew to 216 references, comprising 4,252 pages of patents and publications by the time the re-examination was completed more than seven years later.

- By comparison, the new re-examination request, which was filed on December 21, 2007 by a Chicago attorney named Vernon Francissen who is neither a party to this lawsuit himself nor counsel to any party to this lawsuit, cites eleven new references.  If the number of references at the outset is an indication of the time that will be spent by the PTO – and it surely must have some influence on how long the PTO will take – one would expect the new re-examination to take even longer than the seven year process provoked by a single new reference in the first re-examination.

- The inventors of the patent in suit were Anthony Rozmanith and Dr. Neil Berinson. Anthony Rozmanith is 80 years old; Dr. Berinson is now deceased but is survived by his 70-year-old widow; both live on Social Security payments and royalties from their licenses, and both are in frail health. (Berinson and Rozmanith Decs., Exhibit A). Regardless of any "eventual monetary relief," Mrs. Berinson and Mr. Rozmanith may not be around to be compensated for their invention if another lengthy stay is granted.

- The '341 patent will expire in just over three years from now. If the re-examination Mr. Francissen has requested lasts even half as long as the first re-examination, no injunction against continued infringement will ever be possible – which may be one of the primary reasons why another re-examination is being sought.

- Mr. Francissen's reexamination request depends primarily on two patents, Walters and Pocock, both of which were the subject of the prior seven year reexamination, and which were analyzed at length by the PTO during that process. The eleven new references Mr. Francissen has cited are merely peripheral to the majority of his arguments – they are hardly the "important prior art" that defendants want to make them.

- In short, the equities here favor continuing with this lawsuit. To grant the stay sought by Defendants on the strength of the re-examination request filed by Mr. Francissen on behalf of an anonymous party(ies) would create irreparable hardship for GPH and for the elderly inventors of the '341 patent; and the possibility that this re-examination would result in a holding of invalidity for claim 17 is insufficient to justify such hardship, given that Mr. Francissen's re-examination request depends primarily on re-hashing two prior art patents that the PTO already has dealt with at length in the first, seven-year-long re-examination.

At least one recent decision, *Baratta v. Homeland Housewares, LLC,* 2007 U.S. Dist. LEXIS 92845 (S.D. Fla. 2007) (Exhibit B), faced a very similar situation only months ago. As in *Baratta,* the Court should deny Defendants' request for a stay.

2

II.    **STATEMENT OF FACTS**

Plaintiff GPH, and its predecessor in interest TechSearch LLC ("TechSearch"), began licensing the '341 patent-in-suit about ten years ago.  During 1999 and 2000, more than 50 companies licensed the '341 patent – an impressive record of commercial success.  Mr. Rozmanith and Mrs. Berinson, who receive a portion of the '341 patent licensing revenue, benefited from those licenses.

On June 9, 2000, an anonymous re-examination request based on only one single prior art reference (U.S. Patent No. 5,347,632 to Filepp) led to the first re-examination of the '341 patent.    The first reexamination mushroomed from consideration of the single prior art Filepp patent into a marathon, including 216 prior art references totaling 4,252 pages and creating a record that exceeds 5,400 pages in length (see the attached tabulation of papers in the re-examination, Exhibit D). Notwithstanding the requirement for "special dispatch," the PTO took until July 24, 2007, **more than seven years** from the anonymous request for reexamination on June 6, 2000, to confirm the validity of the '341 patent.  The process included the 93-page written opinion by a three-judge panel reversing the Examiner's rejections in part and affirming the validity of claim 17 of the '341 patent. (Exhibit E).

In September of 2000, the Packers filed a motion to stay the present suit, attacking TechSearch's "extortionate business model" and demanding a stay "to allow the PTO to apply its expertise to the substantial new prior art before it."  (Packer's September 21, 2000 Motion for Stay at 3, Exhibit C).  Thus, beginning in 2000 and continuing for more than seven years, the '341 patent was in re-examination and this lawsuit was held in suspended animation while the PTO considered the claims of the

3

patent. The '341 patent emerged from reexamination with its patentability confirmed on July 24, 2007.

After the PTO issued the reexamination certificate for the '341 patent, GPH (which had acquired the '341 patent from TechSearch during reexamination) sought to restart the licensing and enforcement activities which had been effectively shut down for the preceding seven years. First, GPH requested, and this Court lifted, the stay of litigation in Illinois. Then, GPH also filed additional suits and obtained an additional four licensees in the six months following the conclusion of the reexamination.

Now, another anonymous infringer – perhaps one of the original defendants from eight years ago -- is unwilling to live with the PTO's confirmation of the '341 patent at the conclusion of the first reexamination. On December 13, 2007, a second request to re-examine the '341 patent was filed with the PTO by Vernon Francissen, a Chicago lawyer. As with the first, this second request was made anonymously and Mr. Francissen has not revealed the identity of his client. Mr. Francissen's request suggested to the Patent and Trademark Office what he says are a total of nineteen "substantial new questions of patentability," which he lists at pp. 55-58 of his 59-page-long request (Exhibit F).

Of Mr. Francissen's nineteen supposedly "substantial" and "new" questions, twelve questions are not really "new" at all – they depend for their primary references upon U.S. Patent No. 4,506,387 (Walter) or U.S. Patent No. 5,014,125 (Pocock) – both of which patents were discussed, analyzed and dealt with at onerous length during the re-examination of the '341 patent. Indeed, the PTO Board of Appeals decision affirming the patentability of claim 101 (which was re-numbered as claim 17 at the conclusion of

4

the re-examination) analyzed the Walter patent – upon which Mr. Francissen continues to rely – at length, before holding that claim 101 (now claim 17) is patentable over all 216 references cited in the re-examination that concluded on July 24, 2007. (See pp. 63-67 of the PTO Board decision, Exhibit E).

Importantly, even the Defendants' motion to stay concedes that the finding by the PTO of a significant "new" question of patentability relies upon this old art (Defs. Brf. at 11, n. 8). Tellingly, Defendants concession fails to address how a PTO Examiner would now have a basis to reject claim 17 on the same art for which this rejection was reversed by the Board of Patent Appeals and Interferences during the first reexamination. The Defendants' argument here makes a mockery of the Packer's earlier request for a stay pending "the final outcome" of the reexamination. (Packer's 9/21/00 motion for stay, at p. 7, Exhibit C). Clearly, the only outcome the Packers would deem "final" would be one in which the '341 patent is declared unpatentable – hence the second request for reexamination, as well as for a stay of this case.

Only seven of Mr. Francissen's allegedly "new questions" are independent of the Walter and Pocock patents; the others, therefore, stem from art which has already been considered at length in the re-examination. In those seven "new questions," Mr. Francissen asserts on behalf of his anonymous client that claim 17 of the '341 patent ought to be found invalid for anticipation over four of the eleven new references he has cited, and invalid for obviousness over combinations of one of the new references – a patent to Ivie – with three magazine articles.

Mr. Francissen's December 21, 2007 request is primarily a rehash of the same prior art and the same arguments that the PTO addressed in the first reexamination,

5

i.e., U.S. Patent Nos. 5,014,125 (Pocock et al.), and 4,506,387 (Walter), and despite the fact that Pocock and Walter were specifically addressed by the Examiner and the Board of Patent Appeals in the prior reexamination of the '341 patent. (See, e.g., BPAI decision at pp. 14-15, 63-67, Exhibit E). As far as GPH can tell, Mr. Francissen's request is designed to simply stall (again) the ability of GPH to realize the value of the '341 patent for itself and the inventors. The resulting effect of Mr. Francissen's and his anonymous client's activities permits the various infringers/potential licensees of the '341 patent to wait and hope that this Court will grant yet another stay, and run-out the clock on the remaining three years of the '341 patent, which expires in 2011.

The inventors of the patent in suit are Anthony Rozmanith and Dr. Neil Berinson. Anthony Rozmanith is over 80 years old; Dr. Berinson, now deceased, is survived by his 70-year-old widow. Both Mr. Rozmanith and Mrs. Berinson live on Social Security payments and royalties received from the licensing of the '341 patent; neither are in particularly good health. Mr. Rozmanith suffers from diabetes and had no taxable income at all in 2006. (See Berinson Dec., Exhibit A) Dr. Berinson's widow, who suffers from neuropathy, colitis and arthritis of the hip and spine (as a result of which she is unable to walk without assistance), enjoyed (if that is the appropriate word) a total of $18,100 in taxable income in 2006. *Id.*[1]

Staying this case again will result in another multiyear delay waiting for the conclusion of a second reexamination (which would primarily apply the same references as the first, seven-year-long reexamination) and would cause crippling real hardship for

---

[1] GPH notes that various Defendants in the Florida litigation have moved for a stay based upon the same arguments as the Packers. GPH incorporates its response to that motion (including the supporting declarations summarized in the Amended Complaint of Exhibit D by reference). Also pending, but not fully briefed, is a motion to stay filed by a Declaratory Judgment Plaintiff in Nevada. That attempt to stay likewise relies exclusively upon the same arguments offered by the Defendants in the other cases.

both GPH and the inventors. As the second reexamination will amount to nothing more than a rehash of old prior art references (the Walter and Pocock patents) that the PTO already has considered at length, staying this case again serves no purpose. The Defendants' motion should be denied.

III.     **THE LEGAL STANDARD**

This Court is not required to stay judicial resolution of this case in view of the request for Reexamination before the PTO. See *Viskase Corp. v. American Nat'l Can Co.*, 261 F.3d 1316, 1328 (Fed. Cir. 2001). Whether to grant a stay for purposes of reexamination is within the district court's discretion, and is not mandated by virtue of a simultaneous reexamination proceeding. *Id.*; see also, *Ethicon v. Quigg*, 849 F.2d 1422, 1428 (Fed. Cir. 1988) ("challenging validity in a court and requesting PTO reexamination 'are concepts not in conflict'" quoting *In re Etter*, 756 F.2d 852, 857 (Fed. Cir. 1985)). In deciding whether to stay litigation pending the outcome of reexamination by the PTO, the courts should consider the following three factors: (1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the non-moving party, (2) whether a stay will simplify the issues and streamline the trial, and (3) whether a stay will lessen the burden of litigation. *Baratta*, 2007 U.S. Dist. LEXIS 92845 at *6. All three of these factors weigh against staying this case.

The Supreme Court in *Landis v. North American Co.* cautioned against mechanical or reflexive use of stays. 299 U.S. 248, 256 (1936) ("We must be on our guard against depriving the processes of justice of their suppleness of adaptation to varying conditions."). See also, *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2007 U.S. Dist. LEXIS 44107, *11 (N.D. Cal. 2007) ("There is no *per se* rule that patent cases should be stayed pending reexaminations, because such a rule would invite

7

parties to unilaterally derail litigation.") (citation and internal quotation omitted) (Exhibit G). Such caution is appropriate here, especially given the atypical circumstances presented by this case.

## IV.    DEFENDANTS HAVE NOT JUSTIFIED THE STAY THEY REQUEST

### A.    A Stay Would Unfairly Prejudice GPH

The Defendants argue at a number of points that a stay is "routine" in cases such as the present.  (See, e.g., Defs. Brf. at 9).   The Defendants go on to argue the propriety of a stay regardless of length of the case or its status.  (See Defs. Brf. at 14). Curiously, despite being aware of GPH's briefs before other Courts on other pending stay motions, neither the Defendants' motion nor their supporting memorandum provides any analysis about the propriety of a second stay pending a second reexamination, i.e., where the PTO had already provided its expertise and confirmed the patentability of the patent, such as in *Baratta* (Exhibit B).  Just three months ago, the Court in *Baratta* **denied** a stay pending reexamination, despite the fact that the PTO had granted a second request for reexamination of the patent in suit.   The facts supporting a denial of a stay in *Baratta* were very similar to the facts now facing this Court:

1)    the patent in suit had already survived one reexamination which had taken three years;

2)    the inventor of the patent in suit was 69 years old with heart complications – in "advanced age and poor health" as the court described it – and thus the plaintiffs' case would likely be prejudiced by the grant of another stay; and

3)    the defendant failed to support its assertion that the "patent [in suit] will

8

likely not survive reexamination with its present claims intact."

*Baratta*, 2007 U.S. Dist. LEXIS 92845 at *6. Nor is *Baratta* the only decision denying a

request for a stay pending a second re-examination of a patent. See *Rosenthal Mfg.*

*Co. v. Thermal Equipment, Inc.,* 1988 U.S. Dist. LEXIS 12241 (D. Kan. 1988); *Agar*

*Corp. v. Multi-Fluid, Inc.*, 983 F.Supp. 1126 (S.D. Tx. 1997) discussed *infra*.

In sharp contrast, the Defendants cite only one case — *Rockwood Pigments* —

to support the notion that a second stay is appropriate. Yet, in *Rockwood Pigments*,

unlike the present case, a second stay was not granted. Worse, in *Rockwood*

*Pigments*, the first reexamination spanned only **nine months** in 2001 – the year **before**

**the lawsuit and the infringement in question began** and the second reexamination

was already "well advanced" by the time the motion for stay was filed. *Rockwood*

*Pigments*, 2002 WL 1160170 at *2.

Also unlike this case, the first *Rockwood Pigments'* reexamination did not involve

any final determination about the differences between the Kneidinger reference at issue

and the patent-in-suit – rather, the issue was simply whether or not the Kneidinger

reference was actually prior art. Thus, unlike the present case, the first reexamination

set forth no expert technical analysis from the Patent Office laying out the differences

between the patent in suit and the prior art. Nor (unlike the present case) did the initial

reexamination in *Rockwood Pigments* include any controlling appellate decision from

the Board of Patent Appeals and Interferences to review the Examiner's analysis.

Instead, by the time stay was sought not only was the second reexamination "well

advanced," but it would offer the substantive technical analysis lacking from the

9

previous first reexamination. *Rockwood Pigments*, unlike *Baratta,* is simply inapplicable to the facts of the present case.

While the Defendants' motion has not addressed *Baratta* directly, the Defendants have signaled their likely attack against that case by arguing that the health and financial situation of the inventors is "impertinent information" designed to "play upon readers' emotions."[2]  And admittedly, the *Baratta* inventor was a plaintiff, while in the present case the co-inventors are not parties but do receive a portion of the licensing revenue from the patent in suit.  If anything, that difference means that more people -- the named Plaintiff and two related third parties – would be hurt by a stay.  Mr. Rozmanith and Mrs. Berinson would both be materially prejudiced if one of their two sources of income were again disrupted.  They deserve to enjoy the benefits of their invention while they can.

GPH, too, would be prejudiced – the trial of this case (or any patent case) is best told as a story about the struggle and innovation of the inventors involved. GPH needs the live testimony of Mr. Rozmanith and Mrs. Berinson at trial to tell that story.  GPH would also be prejudiced by a loss of injunctive remedies if it were subject to a second lengthy stay pending the second reexamination.  The '341 patent has only three years of life remaining.  Even if the second reexamination were conducted with **twice** the "special dispatch" of the first proceeding, the '341 patent would expire prior to the lifting of any stay.

---

[2] The Packers' memory must be flawed in this regard, as its first motion for stay in 2000 made much of how they were a "twelve time world champion of professional football" being "bullied" by and fighting against an "extortionate business model."  (Packers 9/21/00 motion to stay at 3, Exhibit C). Having opened the door to this issue, the Packers should not be heard to complain now that the beneficiaries of the patent in question include two senior citizens in failing health and of limited means.

The Defendants' counter to these real inevitabilities is an argument that GPH has not sought a preliminary injunction and thus, by virtue of GPH's delay in seeking injunctive relief, "GPH does not face irreparable harm for which monetary damages would be inadequate if the case were stayed pending PTO reexamination." (Defs. Brf. at 3). Critically, the Defendants confuse the applicability of delay in seeking injunctive relief in the context of a preliminary injunction with the standards for obtaining a permanent injunction. While past delay (e.g., delay in seeking an injunction) may be relevant to the determination of a preliminary injunction, "past conduct does little, if anything, to inform the question of whether [a plaintiff] will be harmed by any future acts of infringement" in granting a permanent injunction. *800 Adept, Inc. v. Murex Securities, Ltd*, 505 F. Supp. 2d 1327, 1337 (M.D. Fla. 2007) (granting a permanent injunction in part over Defendants' objections about delay). Defendants' arguments in support of their stay request are misdirected.

A stay would severely and unfairly prejudice Mr. Rozmanith, Mrs. Berinson and GPH. Defendants fail to prove how or why disregarding this factor is fair and, thus, the Defendants' motion for a stay pending the second reexamination should be denied.

**B.     The Proposed Stay Does Not Promote Judicial Economy**

The Defendants argue that the result of the second reexamination will be different because of 11 pieces of "newly presented prior art" cited in the anonymous second reexamination request. Yet, the Pocock and Walter references relied upon in the second reexamination request (the "newly presented prior art") were all squarely before the Examiner and the Board of Patent Appeals during the first reexamination of the '341 patent. See *Abbott Laboratories v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1357 (Fed.Cir. 2003) (the fact that a skilled examiner passed on that very reference

11

during prosecution may be a factor in validity determination). The second reexamination request is simply a rehash of issues squarely addressed in the first reexamination proceeding – such a procedure hardly promotes judicial economy.

In *Rosenthal Mfg. Co. v. Thermal Equipment, Inc.,* 1988 U.S. Dist. LEXIS 12241 (D. Kan. 1988), the court rejected the argument about "PTO expertise" that the Defendants make here, and held that any supposed benefit from a second reexamination was insufficient to warrant a stay of litigation:

> While there may be some duplication of effort involved in light of the Patent Office proceeding, this fact is of less concern to the court when that proceeding is a second reexamination. The Patent Office has already examined this patent once and found it to be valid. Further, the court has the benefit of the examiner's technical evaluation of the patent from the first reexamination.

*Rosenthal*, 1988 U.S. Dist. LEXIS 12241, at *3-*4. And in *Agar Corp. v. Multi-Fluid, Inc.,* 983 F. Supp. 1126 (S.D. Tx. 1997), the court denied a stay pending a second reexamination for the same reasons cited in *Rosenthal*, and also noted that "If a stay would more likely than not delay the district court proceedings without any countervailing benefit, the court should proceed with the merits of the case without the benefit of the Patent Office reexamination." *Id.* at 1127.

Contrary to Defendants' suggestion, a duplication of effort in this lawsuit would not be avoided by a stay. As the Federal Circuit explained:

> [P]recise ***duplication of effort does not occur*** because the PTO and the courts employ different standards of proof when considering validity, and the courts, unlike the PTO during a reexamination of patent claims, are not limited to review of prior art patents or printed publications, *37 C.F.R. § 1.552(a); In re Etter, 756 F.2d 852, 856, 225 USPQ 1, 4 (Fed. Cir. 1985) (in banc),* but may also consider challenges to validity on other grounds.

\*   \*   \*

12

> The awkwardness presumed to result if the PTO and court reached
> different conclusions is more apparent than real.

*Ethicon*, 849 F. 2d at 1427 (Emphasis added).

This principle is particularly apt here, because the Defendants' invalidity contentions cite statutes and rely upon invalidity defenses which are not implicated in any of the reexamination requests. (See, e.g., the Defendants' answer, citing 35 U.S.C. 112). Indeed, the PTO is limited by statute to considering only printed publication prior art references. 35 U.S.C. 301 (2006). Thus, the PTO cannot even consider certain references or even whole defenses upon which the Defendants might rely upon in this case because at least some of the alleged prior art in the field of the '341 patent is not printed publication art; it consists of materials that supposedly establish prior knowledge, use or sale of the subject matter of the '341 patent. Even with respect to the subset of prior art which the PTO can consider in reexamination, nothing would prevent the Defendants from later rearguing before this Court that the same prior art – by itself or in combination with other "new" prior art – renders the '341 patent invalid. In other words, and as was the case with the first, a second reexamination and a second stay will most likely resolve nothing; Defendants will again rehash for the Court all that the PTO reviewed during the reexamination.

On the other hand, what transpires before this Court could render the proceedings before the PTO moot:

> On the other hand, if the district court determines that the patent is invalid,
> and that decision is either upheld on appeal or not appealed, the PTO may
> discontinue its reexamination, since the district court's order could have
> *res judicata* effect if the "patentee has had a full and fair chance to litigate
> the validity of his patent."

*Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 408 (W.D.N.Y. 1999). Unlike the PTO, a district court is the only forum which is guaranteed to be dispositive of all alleged invalidity defenses in this case. Likewise, only a district court can decide all of the issues in dispute (e.g., infringement) at the same time. This case, before this Court, offers the parties the best opportunity to achieve a complete and total resolution of the issues surrounding the '341 patent. Thus, the Defendants' motion to stay the case should be denied.

## V.    CONCLUSION

Mr. Francissen's re-examination request on behalf of his anonymous client(s), which focuses primarily on the Walter and Pocock patents that were previously considered at length in the seven-year-long re-examination of the '341 patent that the PTO concluded on July 24, 2007, is not a sufficient reason to stay this lawsuit for another re-examination that might well take longer still. See, e.g., *Baratta, Rosenthal,* and *Agar.* The Defendants' motion should be denied.

Respectfully Submitted,

/s/  Paul C. Gibbons
Raymond P. Niro
Joseph N. Hosteny
Arthur A. Gasey
Paul C. Gibbons
NIRO, SCAVONE, HALLER & NIRO
181 West Madison, Suite 4600
Chicago, Illinois  60602
Telephone:  (312) 236-0733

14